IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIRECTV, Inc., | § § § | |
| Plaintiff, | § § | |
| V. | § § | Case No. 03:CV007-RNC |
| MIKE CARON, CHIP FALCONE, MIKE IASEVOLI, MICHAEL MASTRO, JR., HECTOR MONTALVO, AND GEORGE MORGAN | § § § § § § | |
| Defendants. | | |

**AFFIDAVIT OF JAMES F. WHALEN IN SUPPORT OF DIRECTV INC.'S RESPONSE TO DEFENDANT, MIKE CARON'S MOTION FOR SUMMARY JUDGMENT**

BEFORE ME, the undersigned authority, on this day personally appeared James F. Whalen, who is personally known to me, and being first duly sworn according to law, upon his oath, deposed and said:

"My name is James F. Whalen. I am over twenty-one (21) years of age and reside in Los Angeles County, California. I am currently a Director for DIRECTV's Office of Signal Integrity and have held that position for over 4 years. As a Director, I am familiar with the usual and customary business practices involved in all aspects of DIRECTV's investigations of individuals and businesses suspected of illegally obtaining access to DIRECTV programming and the damages that illegal interception causes to the company.

DIRECTV is the nation's leading direct broadcast satellite programming provider, delivering over 225 channels of television and other programming to more than 12 million customers in the United States. DIRECTV satellite programming currently includes major

cable networks, local stations, studio movies and special events programming, as well as a variety of sports and other special interest programming. DIRECTV has invested billions of dollars to develop its direct broadcast satellite system. DIRECTV encrypts – electronically scrambles – its satellite transmissions to provide security for and prevent unauthorized viewing of its satellite television programming. DIRECTV offers its television programming to residential and business customers on a subscription and pay-per-view basis only. Each customer obtains system hardware (including a receiver and a small satellite dish), is provided with a DIRECTV Access Card and is required to establish an account with DIRECTV. Upon activation of the Access Card by DIRECTV, the customer can receive and view in a decrypted format (*i.e.*, unscrambled) those channels to which the customer has subscribed or otherwise made arrangement to purchase from DIRECTV.

DIRECTV offers several different satellite television packages. DIRECTV offers 40 premium movie channels, including several Home Box Office®, Showtime®, Cinemax®, Movie Channel®, and Encore® channels, the Family Pack™ and local channels for many markets throughout the United States. Importantly, DIRECTV targets individuals interested in specialized sports packages and offers subscriptions to those specialized sporting packages, including NFL Sunday Ticket™, NBA League Pass™, NHL Center Ice™, MLB Extra Innings™, ESPN Game Plan™, ESPN Full Court™, MLS/ESPN Shootout™, WNBA Season Pass™, and Mega March Madness™. Each of these packages can be purchased independent of the basic subscription fee. DIRECTV also offers specialized one-time

viewing movies and events in the form of pay-per-view channels, countless pay-per boxing and special event matches. Acquiring the rights to distribute all of this television programming and service requires an incredible expense to the company. For that reason, DIRECTV diligently protects its distribution rights.

Since DIRECTV has acquired such a complete line-up of quality channels, movies, and specialized programs and sporting events, individuals go to great lengths to circumvent DIRECTV's encryption and security measures. The number of individuals involved in the manufacture and sale of illegal devices used to circumvent DIRECTV's encryption technology has increased since DIRECTV began operations in 1994. The business of piracy can be a lucrative endeavor both for the large manufacture and the small dealer. Records obtained pursuant to raids in Canada and in the United States show that pirates have generated substantial revenues from the distribution and manufacture of illegal access devices, often amounting to millions of dollars for an individual distributor of pirate devices. Obviously, there is a substantial black market for pirate access devices used in conjunction with DIRECTV systems, and DIRECTV is pursuing all available avenues to curtail those sales.

Piracy itself by manufacturers and individuals affects DIRECTV immeasurably. An individual using one pirated access card has access to over a million dollars in annual programming services and would not have to pay for any of it. While that figure includes the value of every pay-per-view movie even though the same movie is shown several times a

day, and not many people will view one movie more than once, the value of subscription and movies viewed only once is well over $150,000.00 annually.

### Evidence of Caron's Purchases of Devices Designed for Piracy

Several individuals and companies have engaged in the manufacture and sale of illegal equipment used to circumvent DIRECTV's encryption technology. On or about May 25, 2001, DIRECTV executed a Writ of Seizure, with the assistance of local law enforcement, at the mail shipping facility used by a company by the name of DSS-Stuff. The mail facility, known as Fulfillment Plus, was located in Santa Ana, California. Subsequent to the raids, DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, credit card receipts and other records. Those records evidence Defendant Mike Caron's purchase of a Terminator Unlooper/Vector Next Gen Combo. Caron's purchase consisted of two devices – a Terminator Unlooper and a Vector Next Generation programmer. The devices are primarily designed for the surreptitious interception of DIRECTV satellite programming. Caron purchased the devices on or about September 5, 2000. Attached hereto as Exhibit A-1 is a copy of the invoice obtained by DIRECTV pursuant to the civil raid at Fulfillment Plus shipping facility located in California. Caron does not dispute that he purchased the devices in question.

I am familiar with the operation of devices used to obtain access to DIRECTV's satellite signal without authorization. The Terminator Unlooper device purchased by Caron is known as an "unlooper" which is primarily designed and marketed to be used in order to

gain unauthorized access to DIRECTV satellite programming without payment to DIRECTV. More particularly, the "unlooper" is designed to restore functionality to illegally modified DIRECTV access cards that were disabled by misuse or by DIRECTV's electronic security measures commonly referred to as Electronic Counter Measures or "ECMs." An ECM is sent electronically by DIRECTV by satellite and is intended to disable illegally modified DIRECTV access cards that are being used to receive DIRECTV programming without authorization. Once these cards are disabled, (or are "looped" as the condition is known), they no longer allow free viewing of DIRECTV programming without the additional use of other electronic devices or equipment to return the illegal functionality. Individuals interested in continuing the illegal receipt of DIRECTV programming use an unlooper to restore functionality to a disabled card, thus allowing the access card to once again receive DIRECTV programming for free. Indeed, the term "unlooper" was coined specifically to refer to devices that restore functionality to "looped" pirated DIRECTV access cards.

Purchase and use of an unlooper is a clear indication of the customers' eagerness to continue illegal access to DIRECTV television programming without payment to DIRECTV. Furthermore, purchase of an unlooper indicates that the person purchasing it already possessed one or more illegally modified DIRECTV access cards. DIRECTV is unaware of any legitimate commercial or private use for unloopers.

The Vector Next Generation programmer purchased by Defendant from DSS-Stuff on September 5, 2000 is designed, marketed, and used to permit the illegal programming of —

writing of code to — valid DIRECTV Access Cards for the sole purpose of obtaining access to DIRECTV Satellite Programming without paying DIRECTV. By way of example, the programmer is used (i) to "clone" Access Cards, enabling an unauthorized (or unactivated) Access Card to decrypt the same programming as a particular authorized (or activated) Access Card; or (ii) to program Access Cards to receive all DIRECTV programming, including pay-per-view events, without payment to DIRECTV.

Importantly, the unlooper purchased by Caron is designed to restore functionality to illegally modified Access Cards disabled by misuse or by DIRECTV's electronic counter measures. Therefore, it is reasonably likely that Caron possessed an illegally modified Access Card and began receiving DIRECTV's transmissions without authorization prior to the purchase of the devices on September 5, 2000. The DIRECTV account history, attached as *Exhibit B (Fong Affidavit)* and incorporated by reference, directly supports the conclusion that Caron actually began receiving DIRECTV programming without authorization prior to the purchase in question.

### Evidence of the Marketing of the Devices

Information on the website operated by DSS-Stuff from which the defendant's purchases were made describe devices primarily designed and used for the purpose of pirating DIRECTV programming. Prints of those websites are attached hereto as Exhibit A-2 and are the type of information typically relied upon by DIRECTV in assessing the design, marketing and purpose of devices. The way in which DSS-Stuff marketed its devices

supports my conclusion that its devices were produced primarily for the purpose of receiving DIRECTV programming for free. The Internet web site operated by the company and attached hereto was devoted to selling devices to obtain DIRECTV satellite programming without payment to or authorization from DIRECTV. Additionally, the web site made it abundantly clear that the bootloaders, unloopers, programmers and other similar devices purchased from their site are intended to be used for receiving DIRECTV programming for free.

### Evidence of Caron's Activity in the Internet Piracy Community

Finally, DIRECTV has been able to develop evidence that Caron, using a name of "major222", visted several websites relating to the piracy of DIRECTV's signal, including www.huabc.com and www.searchingforsignal.com. Each of these web sites was dedicated to the distribution of software and information related to DIRECTV piracy. Many of Caron's posts on searchforsignal.com in 2002 and 2003 mention use of "h" and "hu" cards, (specifically referring to DIRECTV's P2 and P3 access cards), receiving DIRECTV's investigation letters, getting served with this lawsuit, seeking counsel and stories that he told DIRECTV and his counsel. *See attached Walker Aff.* Caron's incriminating postings plainly show his involvement in piracy of DIRECTV's programming. The huabc.com website, which Caron joined on or about October 6, 2001, provides information regarding DIRECTV piracy. The name of the cite – "huabc" – again refers to DIRECTV's P3 access card (known in the piracy community as "HU" cards) and contains discussion forum references such as

"Unlooping HU (P3)" and "HU Card" (which is a discussion related to problems associated to using an illegally modified HU Card).

### Evidence of Unauthorized Access to DIRECTV Programming Shown in Caron's DIRECTV Account History

Caron's account evidences unauthorized access to DIRECTV satellite programming. Caron's DIRECTV account shows programming and numerous pay-per-view purchases between January 24, 1999 and April 1999. Caron then disconnects service on June 25, 1999 and told the customer service representative that he "sold house/equip" indicating that he was leaving that residence. Importantly, the purchase of an unlooper indicates prior unauthorized access; thus, defendant's disconnect in June of 1999 and probable unauthorized access to DIRECTV programming at that point or shortly thereafter is consistent with his purchase of the unlooper in September 2000. Obviously, if Caron obtains access to DIRECTV programming without authorization, he would not need to keep his services active.

Caron then purchased additional receivers and access cards and reconnected his services on January 24, 2002 **at the same address** and **under the same telephone number**. Apparently, despite telling DIRECTV he was moving, he had not moved at all. Caron's need to purchase new receivers in 2002 is an indication that he had damaged the access cards he had in his possession in 1999 through prior misuse. Each of the receivers used by Caron prior to his disconnect in June of 1999 contained DIRECTV P2 access cards, (otherwise known in the piracy community as "H" cards), which can be used with the equipment purchased by Caron in September of 2000 to gain access to DIRECTV programming without

authorization. Again, due to DIRECTV's efforts to combat piracy through ECM's, pirated access cards can become damaged while in use. Damage to the pirated access cards explains Caron's need to purchase additional access cards and reconnect programming services in January 2002.

Based on the account history and gaps in his programming services, Caron's purchase of several devices primarily designed to intercept DIRECTV's programming, and his posting and internet activity, there is little question that Caron gained unauthorized access to DIRECTV programming.

_____
James F. Whalen

STATE OF TEXAS          )
                        )
COUNTY OF _____     )

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 2nd day of March, 2004, to certify which witness my hand and official seal.



_____
NOTARY PUBLIC in and for
The State of  Texas
My commission expires: 2-11-2008

DIANNA PONCE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 02-11-08



DTV 5228474 (disc)
CT-0008

# DSS-STUFF.COM   PACKING SLIP

Invoice: 188
Date/Time 09/05/2000 21:20:08
FEDERAL EXPRESS SECOND DAY

| Ship to: | Sold To: |
|---|---|
| MIKE CARON | MIKE CARON |
| 52 BLUE JAY DRIVE | 52 BLUE JAY DRIVE |
| NORTHFORD CONNECTICUT 06472 UNITED STATES | NORTHFORD CONNECTICUT 06472 UNITED STATES MAJOR222@HOTMAIL.COM |

| Description | Quantity |
|---|---|
| 005 TERMINATOR UNLOOPER "WITH CASE" / VECTOR NEXT GEN COMBO | 1 |

```
Invoice: 467       Track: 477290270924
Customer:          Mode: FedEx 2 Day
Dept:              Date: 09/06/2000
                   Weight:           Shipping:   7.05
                          1.00 Special:          0.00
                   COD:   0.00 Handling:         0.00
                   DV:    0.00 Total:            7.33
```

Note: This document is referenced as Exhibit A-1 in the affidavit of James F. Whalen. It is referenced as Exhibit B in the Plaintiff's Opposition to the Motion for Summary Judgment.

Thank you for your business! We appreciate your support

FP019865

# EXHIBIT B

stuff.com                                                                 http://www.dss-stuff.com/home.htm



Note: This document is referenced as Exhibit A-2 in the affidavit of James F. Whalen. It is referenced as Exhibit B in the Plaintiff's Opposition to the Motion for Summary Judgment.



of 1                                                                                              5/7/01 3:12



stuff.com  
http://www.dss-stuff.com/unloopers.htm

tuff.com                                                                 http://www.dss-stuff.com/unloopers.htm

(not provided). Test software can be found at www.infositeonline.com + HERE